NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

12-P-132                                        Appeals Court

COMMONWEALTH  vs.  MELISSA PECK.


No. 12-P-132.

Berkshire.        March 12, 2014. - July 16, 2014.

Present:  Vuono, Grainger, & Agnes, JJ.


Practice, Criminal, Cross-examination by prosecutor, Loss of
     evidence by prosecution, Preservation of evidence.
     Evidence, Cross-examination, Prior inconsistent statement,
     Impeachment of credibility, Expert opinion, Exculpatory.
     Witness, Cross-examination, Impeachment, Expert.  Fraud.
     Insurance, Defrauding insurer, Motor vehicle insurance.
     Motor Vehicle, Insurance.  Conspiracy.  Larceny.  Attempt.



     Complaint received and sworn to in the Pittsfield Division
of the District Court Department on November 25, 2009.

     The case was tried before Fredric D. Rutberg, J.


     Esther J. Horwich (Justin R. Dashner with her) for the
defendant.
     James F. Petersen, Assistant District Attorney, submitted a
brief for the Commonwealth.


     AGNES, J.  At trial, the defendant, Melissa Peck, testified

as the only witness for the defense and denied the allegations

that she and her former husband had engaged in an automobile insurance fraud.[1] On cross-examination, over objection, the judge permitted the prosecutor to ask her a series of questions about prior incriminating statements she allegedly made to a former boyfriend, after the date of the alleged offenses, despite the fact that the judge was aware that the Commonwealth did not have admissible evidence from another witness that the statements had been made. It was error to permit this type of cross-examination of the defendant, which improperly impeached the witness by insinuation, and unfairly "cast on the other side (here the defendant-witness) a burden somehow to fend against it." Commonwealth v. Delrio, 22 Mass. App. Ct. 712, 721 (1986). Because we determine that the improper cross-examination was prejudicial, we must reverse the convictions.[2]

Background. The jury could have found that on July 14, 2008, the defendant parked her car on North Street in front of

---

[1] The defendant was charged by complaint with filing a false motor vehicle insurance claim, in violation of G. L. c. 266, 111B; conspiracy in violation of G. L. c. 274, § 7; attempt to commit a crime, in violation of G. L. c. 274, § 6; and making a false report of a motor vehicle theft, in violation of G. L. c. 268, § 39. On July 18 and 19, 2011, the defendant was tried before a jury of six. On July 20, 2011, the jury found the defendant guilty on all four counts.

[2] Based on this conclusion, it is unnecessary to consider other issues raised by the defendant with the exception of her claims that the Commonwealth is responsible for the loss of evidence and that there was insufficient evidence, both of which we discuss, infra.

the Berkshire Medical Center (BMC) in Pittsfield.  While she was inside the BMC, Pittsfield parking authority Officer Thomas Siok checked the license plate numbers of the cars parked on North Street and discovered that the defendant's vehicle had several unpaid parking tickets.  Siok followed parking authority protocol and attached a "boot" to the defendant's car.  This device is designed to prevent a vehicle from being moved until the appropriate authority unlocks and removes it.[3]

The defendant got a ride to city hall to pay the parking tickets.  There, she learned that the total amount she owed was more than she expected, and that she could not pay with a personal check.  The defendant was told that unless the unpaid tickets were paid within three days, the city would tow and impound her car.

The defendant returned to the car after her trip to city hall.  John Tart, her former husband, was at that location.  A surveillance video played for the jury reveals the defendant and Tart near the car.  She is seen removing a child's car seat from the car while Tart walks over to the booted wheel.  The video also reveals the defendant walking over and standing next to Tart for approximately twenty seconds as he crouches down near

_____

[3] Officer Siok testified that due to the type of wheel on the defendant's car, the boot did not fit as tightly as it was designed to and that it was possible for a person to remove it by "shak[ing] it off."

the booted wheel.  The defendant then walks away from the car, and about thirty seconds later, Tart is seen entering the car and driving away.

The next day, Pittsfield police Sergeant Mark Lenihan received a call from the Pittsfield parking authority inquiring about the defendant's booted car; both the car and the boot were missing.  Sergeant Lenihan visited the defendant at her home to ask about the location of her car.[4]  The defendant told Sergeant Lenihan that she had last seen the car parked on North Street with a parking boot attached to it, and had no knowledge of what had happened thereafter.  She indicated she had left one set of keys to the vehicle in the glove box. [5]  The defendant completed the paperwork necessary to make a stolen car report while Sergeant Linehan was present.[6]

On July 19, 2008, the defendant's car was located in a State forest.  The windows of the car were smashed, the tires

---

[4] The vehicle was co-owned by the defendant and Tart and registered to both of them.  However, the vehicle was under the control of the defendant, who allowed Tart to drive it from time to time.  The defendant had two sets of keys to the vehicle. Tart did not have a set of keys.

[5] The defendant testified that she kept one set of keys and locked the other in the vehicle's glove box.

[6] Both the defendant and Sergeant Linehan signed the report. Linehan later entered the data into the national criminal information system's registry of stolen vehicles and filed a copy of the report with his department.  The report was received in evidence.

were slashed, there was collision damage, there were beer bottles in the car, and the ignition was damaged with exposed wires. However, there was testimony that the vandalism and ignition damage were not consistent with theft. The jury heard testimony from a forensic mechanic and saw photographs of the vehicle's appearance when it was recovered. The jury could have found that the vehicle was made to look like it had been stolen.

The defendant was interviewed by the insurer's fraud investigator in August, 2008. At that time, she said she had both sets of keys to her vehicle in her physical possession. She also said that she spoke to Tart the day after she was interviewed by Sergeant Linehan and told him that he had to file a claim with the insurer so she could qualify for reimbursement for the cost of renting another vehicle. The insurer denied the defendant's insurance claim and reported the case to the insurance fraud bureau of Massachusetts (fraud bureau) for investigation.

In May, 2009, the defendant was interviewed by a senior investigator with the fraud bureau. She told the investigator that she had done nothing wrong and gave him an exculpatory account of the events on the day in question. The investigator played for her the video surveillance tape, which showed that less than one minute after the defendant walked away from the vehicle, it was driven away by Tart. The investigator asked her

several times to identify the male shown in the video. She refused, telling him, "she can't say and she won't say," and that it was his "job to figure out who that male was." The defendant was interviewed again by the investigator in July, 2009, at the Pittsfield police station. The defendant was advised of her Miranda rights and agreed to speak to the police and the investigator. Her statements were identical to those she made during the previous interview.

Discussion. 1. Improper cross-examination. On cross-examination, the prosecutor established that the defendant's former boyfriend, Junior Sanchez, drove her and her daughter to the interview with the investigator in May, 2009. There was an objection prior to any questions being asked about a conversation between the defendant and Sanchez on that occasion. During an unrecorded sidebar conversation,[7] the judge ruled that

---

[7] Unfortunately, the ensuing sidebar conversation was inaudible and there is no transcript of what was said. However, the judge allowed a motion by the Commonwealth to expand the record to include an account of the sidebar discussion supplied by the prosecutor. The prosecutor's affidavit states that a timely objection was made by defense counsel to any inquiry of the defendant concerning conversations with Sanchez because Sanchez was not present. The prosecutor told the judge that he had a good faith basis for the inquiry because he had a fraud bureau report that contained an interview with Sanchez, and he intended to ask only leading questions based on the contents of that fraud bureau report. According to the prosecutor's affidavit, the judge ruled that the prosecutor had a good faith basis and could "ask the Defendant if she recalled certain specifics of that conversation [with Sanchez]. He [the judge]

because the prosecutor had a report in which Sanchez told the police and the fraud bureau that the defendant had confessed to her involvement in the insurance fraud scheme with Tart, there was a good faith basis for the prosecutor to inquire of the defendant about the conversation even though Sanchez was not present to testify.  Accordingly, the prosecutor asked the defendant five questions about the conversation she reportedly had with Sanchez.  These questions are set forth below in the margin.[8]  Sanchez did not appear or give testimony at trial.  The

---

also noted that given Sanchez's absence, [the prosecutor] would 'be stuck with [the defendant's] answers.'"

[8] At trial, the prosecutor had the following exchange with the defendant on cross-examination:

Q.:   "Do you recall discussing with [Sanchez] yours [sic] and John Tart deciding to make this look like a stolen motor vehicle?"

A.:   "Absolutely not."

Q.:   "Do you recall telling [Sanchez] that [Tart] and his brother Jesse were going to take the truck to their mother's address and vandalize it, put a bunch of empty beer bottles to make it look like a bunch of kids stole it?"

A.:   "Absolutely not."

Q.:   "Do you recall telling [Sanchez] that they were going to rip the steering column out and make it look hotwired so it could start again and bring it to an area where they know there had been stolen motor vehicles in the past?"

A.:   "Absolutely not."

report of his interview was not offered as an exhibit or marked for identification although the prosecutor showed it to the judge at sidebar.

Massachusetts evidence law prohibits "an attorney, through cross-examination of a witness, [from] communicat[ing] an impression by innuendo that he or she possesses as yet undisclosed information, with no good faith basis for doing so." Commonwealth v. Johnston, 467 Mass. 674, 699 (2014), citing Commonwealth v. Christian, 430 Mass. 552, 561 (2000), overruled on other grounds by Commonwealth v. Paulding, 438 Mass. 1 (2002).  In Christian, supra at 559-563, the defendant was asked a series of questions on cross-examination about inculpatory statements the defendant allegedly made to an inmate who had been in jail with the defendant.  The defendant had not referred to any conversation with the inmate during direct examination. The inmate was not called as a witness.  The defendant denied making each of the statements.  The Supreme Judicial Court

Q.:  "Do you remember specifically telling [Sanchez] that when you filled out the report at Pittsfield Police Department you knew, in fact, it was not stolen?"

A.:  "Absolutely not."

Q.:  "Do you remember stating to him that you had no, excuse me, that if ever caught, [Tart] would take the blame, say you have no knowledge of this, if anything goes down you, he will take the whole blame, that you won't go to jail or lose your job at all?"

A.:  "Absolutely not."

described this approach as "an improper tactic which has often been condemned by the courts." Id. at 561 (quotation omitted). See Commonwealth v. Johnson, 431 Mass. 535, 541 n.3 (2000) ("Rule 3.4(e) of the Massachusetts Rules of Professional Conduct, 426 Mass. 1389 (1998), states: "A lawyer shall not: . . . (e) in trial, allude to any matter that . . . will not be supported by admissible evidence").[9]

The Commonwealth maintains that the cross-examination in this case was not impermissible because there was a good faith basis for the questions at issue even though the person to whom the defendant allegedly made the statements, Sanchez, did not testify. While we agree that the prosecutor acted appropriately by informing the judge that Sanchez was not available to testify and by providing the judge with a copy of the report containing Sanchez's statements, the cross-examination was nevertheless improper.

The Commonwealth relies on the observation in Commonwealth v. White, 367 Mass. 280, 285 (1975), that "[a] criminal defendant is not denied a fair trial by rigorous cross-examination of witnesses concerning their prior inconsistent

---

[9] As in Commonwealth v. Fordham, 417 Mass. 10, 21 (1994), "[i]t is extremely unlikely that the prosecutor in this case expected an affirmative answer to his question or that his purpose in asking it was to gain an admission. Rather, it appears that he was using cross-examination to communicate an impression (and perhaps also to imply that he, the prosecutor, had some as yet undisclosed information) by innuendo."

statements, unless the examination is shown to have been conducted in bad faith or without foundation."  However, the requirement noted in White (that the examiner must have a good faith basis and proper foundation for cross-examination) is simply another way of saying that the examiner must have a reasonable belief that the facts implied by the questions could be established by admissible evidence.  See Commonwealth v. Marsh, 354 Mass. 713, 720 (1968). [10]  In the present case, as in Christian, 430 Mass. at 561-562, the prosecutor's questions had the effect of informing the jury of the contents of out-of-court statements allegedly made by the defendant that were not admissible because (1) the witness who reportedly heard them and could have testified about them did not testify, see Mass. G. Evid. § 801(d)(2)(A) (2014) (admission of a party opponent), and (2) the defendant under cross-examination denied making them so that they did not qualify as prior inconsistent statements.  See Mass. G. Evid. § 613(a)(1) (2014).[11]

_____

[10] We also note that it is error for a judge to overrule an objection where a prosecutor's leading questions effectively offer extrajudicial testimony as evidence through innuendo and insinuation.  See, e.g., Commonwealth v. Fordham, 417 Mass. at 20-21; Commonwealth v. Francis, 432 Mass. 353, 363 (2000); Commonwealth v. Stewart, 454 Mass. 527, 531-532 (2009); Commonwealth v. Benoit, 32 Mass. App. Ct. 111, 115-117 (1992); Commonwealth v. Wynter, 55 Mass. App. Ct. 337, 341-343 (2002).

[11] The principle at stake in this case, as explained in the Christian, White, and Delrio cases, among others, would not have been offended by an open-ended question about whether the

Because the error was preserved, we must determine whether "the error did not influence the jury, or had but very slight effect." Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994), quoting from Commonwealth v. Peruzzi, 15 Mass. App. Ct. 437, 445 (1983) (nonconstitutional error).[12]  The defendant, who was the sole witness for the defense, was prejudiced by the improper insinuations and innuendo.  Although the case against the defendant was a solid circumstantial case in that the Commonwealth supplied evidence of her motive, and her interaction with Tart only a moment before he drove away in the vehicle, there was no direct evidence tying her to the crime other than the inference resulting from the prosecutor's improper cross-examination.  The repeated and improper insinuations struck at the heart of the defense by suggesting that the defendant confessed to the crimes charged.  This is not a case in which the jury received strong, curative instructions

_____

defendant recalled a conversation with Sanchez about the charges against her.  If the defendant responded by stating a failure of memory, the prosecutor could have refreshed her memory using the statement given by Sanchez.  See Mass. G. Evid. § 612(a) (2014).  If the defendant recalled such a conversation, the prosecutor could have asked at least one additional question such as whether the defendant made statements about her involvement with Tart in a plan to defraud the insurer.

[12] As in Commonwealth v. Stewart, 454 Mass. at 533 n.6, in view of the result we reach, there is no need to address the applicability of Crawford v. Washington, 541 U.S. 36 (2004).

at the time, and during the judge's final charge there was only a general instruction that questions are not evidence.[13]

2. <u>Sufficiency of the evidence</u>. At the close of the Commonwealth's case, the defendant filed a motion for a directed finding on all charges. Mass.R.Crim.P. 25, as amended, 420 Mass. 1502 (1995). In assessing the sufficiency of the evidence, we view it in the light most favorable to the Commonwealth. <u>Commonwealth</u> v. <u>Latimore</u>, 378 Mass. 671, 676-677 (1979). It is well established that "a conviction may be properly based entirely on circumstantial evidence so long as that evidence establishes the defendant's guilt beyond a reasonable doubt." <u>Commonwealth</u> v. <u>Pike</u>, 430 Mass. 317, 321 (1999), quoting from <u>Commonwealth</u> v. <u>Martino</u>, 412 Mass. 267, 272 (1992). "To survive a motion for a required finding, it is not essential that the inferences drawn are necessary inferences. It is enough that from the evidence presented a jury could, within reason and without speculation, draw them." <u>Commonwealth</u> v. <u>Gonzalez</u>, 47 Mass. App. Ct. 255, 257 (1999).

---

[13] In his final charge to the jury, the judge stated that "a lot of questions were asked of various witnesses during the course of this trial. 'Isn't it true that this happened? Isn't it true that that happened? Is it true the next thing happened?' And if the answers were no, it's not, even if you believe, even if you think that the person wasn't telling the truth, it's not affirmative evidence that the other thing happened."

a. _Conspiracy_. The defendant was charged with conspiracy, a crime prohibited by G. L. c. 274, § 7. "The acts of different persons who are shown to have known each other, or to have been in communication with each other, directed towards the accomplishment of the same object, especially if by the same means or in the same manner, may be satisfactory proof of a conspiracy.'" Commonwealth v. Nee, 458 Mass. 174, 181 (2010) (quotation omitted). In this case, there was ample circumstantial evidence to permit the jury to find beyond a reasonable doubt that the defendant and Tart acted together and participated knowingly in a scheme to file a false motor vehicle insurance claim and make a false report of motor vehicle theft in order to defraud an insurance company.

b. _False motor vehicle insurance claim_. The defendant could have been convicted of filing a false motor vehicle insurance claim under a theory of joint venture. A defendant can be convicted of a crime as an aider and abettor if "the defendant knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that offense." Commonwealth v. Zanetti, 454 Mass. 449, 466 (2009). A defendant commits insurance fraud as defined by G. L. c. 266, § 111B, if she "ma[kes] a claim under a motor vehicle insurance policy, with intent to defraud the insurer, by furnishing the insurer false statements in order to obtain payment of insurance

proceeds." Commonwealth v. Chery, 36 Mass. App. Ct. 913, 913 (1994). Here, the evidence described above established that the defendant had a motive, and actively participated in the events involving the staging of a false theft of her vehicle, falsely reported it stolen, and thereby facilitated the filing of a false insurance claim by Tart.

c. False report of motor vehicle theft. Contrary to the defendant's argument, there was sufficient evidence that she filed a false report of motor vehicle theft in violation of G. L. c. 268, § 39. The statute requires proof "that the defendant 'knowingly' ma[d]e a false written statement on a form bearing notice that false statements made therein are punishable under the penalty of perjury." Commonwealth v. Kelly, 69 Mass. App. Ct. 751, 754-755 (2007). It was sufficient that the perjury warning in this case was clearly visible on the stolen motor vehicle form, located immediately above the signature line in boldface, prefaced by the word "warning" in large, capital letters. See id. at 755.

d. Attempt to commit a crime. There was also sufficient evidence that the defendant attempted to commit larceny against the insurance company. "The crime of attempt consists of the

intent to commit the underlying crime coupled with an overt act." Commonwealth v. Horton, 434 Mass. 823, 836 (2001).[14]

Here, the evidence was more than sufficient for a jury to conclude beyond a reasonable doubt that the defendant and Tart worked together to stage a false theft of her vehicle, to falsely claim to the police that it had been stolen, and to file a false report with the insurance company with the intent to defraud and financially injure the insurance company by attempting to collect an insurance award that she was not entitled to receive.

3. Expert witness testimony about lost evidence. The charges against the defendant were not filed until after her vehicle was released to her insurer and sold at auction. She argues that in such circumstances it was error to allow the Commonwealth's expert to testify about the condition in which her vehicle was found without an opportunity to have a defense expert examine the vehicle. Here, the defendant has not met her burden of establishing that there was a reasonable possibility that if the vehicle had not been discarded it would have yielded favorable evidence for the defense. See Commonwealth v.

---

[14] General Laws c. 266, § 30, "merged into one crime, larceny, what had formerly been three separate crimes: larceny by stealing, embezzlement, and larceny by false pretenses. Larceny can be established by evidence warranting a conviction on any of the three theories." Commonwealth v. Cheromcka, 66 Mass. App. Ct. 771, 773 (2006) (citation omitted).

Dinkins, 440 Mass. 715, 717 (2004); Commonwealth v. Kee, 449 Mass. 550, 554-555 (2007).

Conclusion. In Commonwealth v. Delrio, 22 Mass. App. Ct. at 721, we said that "[w]here an examiner on cross-examination suggests new facts in an effort to impeach a witness, the examiner should be required to represent that he has a reasonable basis for the suggestion, and also to be prepared with proof if the witness does not acquiesce in the suggestion by giving a self-impeaching answer." In this case, the judge was aware that the Commonwealth did not have admissible evidence of the defendant's out-of-court statements, and thus should not have permitted the prosecutor to ask her a series of questions insinuating that she had admitted her complicity in a scheme to defraud her insurer. Because there was a timely objection and the improper questions caused prejudice, the convictions must be reversed.

Verdicts set aside.

Judgments reversed.